J-S06016-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.S.M.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.R.D., MOTHER | : | No. 2363 EDA 2016 |

Appeal from the Decree June 21, 2016
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000634-2015,
CP-51-DP-0001913-2012, FID# 51-FN-002204-2012

| | | |
|---|---|---|
| IN THE INTEREST OF: A.S.M.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.R.D., MOTHER | : | No. 2367 EDA 2016 |

Appeal from the Decree June 21, 2016
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000635-2015,
CP-51-DP-0001381-2012, FID# 51-FN-002204-2012

IN THE INTEREST OF: A.M.D., A     :     IN THE SUPERIOR COURT OF
MINOR     :     PENNSYLVANIA
    :
    :
    :
    :
    :
    :
    :
APPEAL OF: A.R.D., MOTHER     :     No. 2368 EDA 2016

Appeal from the Decree June 21, 2016
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000636-2015,
CP-51-DP-0001906-2014, FID# 51-FN-002204-2012


IN THE INTEREST OF: A.L.L.D., A     :     IN THE SUPERIOR COURT OF
MINOR     :     PENNSYLVANIA
    :
    :
    :
    :
    :
    :
    :
APPEAL OF: A.R.D., MOTHER     :     No. 2369 EDA 2016

Appeal from the Decree June 21, 2016
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000637-2015,
CP-51-DP-0001563-2013, FID# 51-FN-002204-2012


BEFORE: MOULTON, RANSOM, and FITZGERALD[*], JJ.

MEMORANDUM BY RANSOM, J.:     **FILED APRIL 06, 2017**

Appellant, A.R.D. ("Mother"), appeals from the decrees entered June 21, 2016, in the Philadelphia County Court of Common Pleas, which involuntarily terminated her parental rights to her minor children, A.S.M.B.1,

---

[*] Former Justice specially assigned to the Superior Court.

- 2 -

a female born in November 2008; A.S.M.B.2, a male born in February 2012; A.L.L.D., a male born in May 2013; and A.M.D., a female born in July 2014 (collectively, "the Children").[1]  In addition, Mother appeals from the orders entered that same day, which changed the Children's permanency goals to adoption.  After a thorough review of the record, we affirm.

The instant matter has a lengthy procedural history commencing on August 3, 2012, when the Philadelphia Department of Human Services ("DHS") obtained an Order of Protective Custody ("OPC") with respect to A.S.M.B.2, based on allegations that he suffered a skull fracture and rib fractures that Mother could not explain.  DHS filed a dependency petition on August 9, 2012, and A.S.M.B.2 was adjudicated dependent by order entered August 14, 2012.  A.S.M.B.2 returned to Mother's care on August 19, 2012, after an additional medical evaluation did not produce evidence that Mother committed child abuse.  However, A.S.M.B.2 remained dependent.

DHS obtained orders of protective custody with respect to A.S.M.B.1 and A.S.M.B.2 on October 18, 2012, based on allegations that Mother failed to bring A.S.M.B.2 to his medical appointments, and was "being held at Vision Quest on a delinquent petition and it is unknown when she'll be

_____

[1] On May 18, 2016, the trial court entered separate decrees terminating the parental rights of M.B., the father of A.S.M.B.2, A.L.L.D., and A.M.D.  The court also entered a decree terminating the parental rights of the unknown father of A.S.M.B.1.  Neither M.B., nor any unknown father, appealed the termination of his parental rights.

released." Application for Order of Protective Custody (A.S.M.B.1), 10/18/2012, at 1. DHS filed a dependency petition with respect to A.S.M.B.1 on October 24, 2012, and she was adjudicated dependent by order entered October 25, 2012.

DHS filed a dependency petition with respect to A.L.L.D. approximately two months after his birth on July 22, 2013. In its petition, DHS alleged that Mother was participating in unsupervised day visits with A.S.M.B.1 and A.S.M.B.2., and that she left A.S.M.B.1, A.S.M.B.2., and A.L.L.D. at the home of M.B. Mother then returned to M.B.'s home in an effort to retrieve the three children, which, for reasons not detailed in the petition, resulted in Mother being arrested and charged with a variety of criminal offenses, including burglary. A.L.L.D. was adjudicated dependent by order entered August 8, 2013, but remained in Mother's care. DHS obtained an order of protective custody with respect to A.L.L.D. on November 6, 2013, due to Mother's lack of appropriate housing. Finally, DHS filed a dependency petition with respect to A.M.D. about a month after her birth on August 12, 2014. DHS obtained an OPC with respect to A.M.D. on September 23, 2014, based on allegations that Mother threatened to kill both A.M.D. and herself. DHS filed an amended dependency petition on September 26, 2014, and A.M.D. was adjudicated dependent on October 8, 2014.

On September 18, 2015, DHS filed petitions to involuntary terminate Mother's parental rights to the Children, and petitions to change the Children's permanency goals to adoption. The trial court conducted a

- 4 -

termination and goal change hearing on May 18, 2016, and June 21, 2016. Following the hearing, on June 21, 2016, the court entered decrees terminating Mother's parental rights, and permanency review orders changing the Children's permanency goals.[2] Mother timely filed notices of appeal on July 20, 2016, along with concise statements of errors complained of on appeal.

Mother now raises five questions for our review.

1. Did the Court below erroneously find that [Mother] had abandoned the [C]hildren?

2. Did the Court below erroneously find that there were dependency issues which had not been resolved or which could not be resolved within a reasonable period of time?

3. Did the Court below erroneously find that witnesses who opposed the goal of adoption were only partially credible?

4. Did the Court erroneously find that adoption was in the [C]hildren's best interests?

---

[2] We observe that the trial court entered permanency review orders on May 18, 2016, stating for each of the Children that "the new permanent placement goal [is] hereby determined to be Adoption." *See*, *e.g.*, Permanency Review Order (A.S.M.B.1), 5/18/2016, at 1. However, in its June 21, 2016 permanency review orders, the court indicated that the Children's permanency goals remained "return to parent or guardian," and again stated that "the new permanent placement goal [is] hereby determined to be Adoption." *See*, *e.g.*, Permanency Review Order (A.S.M.B.1), 6/21/2016, at 1. It appears that the court did not intend to change the Children's permanency goals until June 21, 2016, given that the court said nothing about changing the goals at the conclusion of testimony on May 18, 2016, and first indicated that it would issue goal change orders on June 21, 2016. *See* N.T., 6/21/2016, at 61 ("So with that we're in a position to now move the goal to adoption for all four of these children.").

5. Did the Court erroneously find that there was lack of services available to meet the [C]hildren's special needs in the county where [Mother] resided in/had moved to?

Mother's brief at 3 (trial court answers omitted).[3]

We address Mother's claims mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

---

[3] While Mother stated in her notices of appeal that she intended to appeal both the termination of her parental rights and the goal changes to adoption, Mother fails to develop any argument in her brief that the court erred or abused its discretion by changing the Children's permanency goals. Mother also fails to cite any authority relating to the goal change orders. Accordingly, Mother has failed to preserve any challenge to these orders for our review. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011), *appeal denied*, 24 A.3d 364 (Pa. 2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa. Super. 2010)) ("'[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.'").

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Section 2511(a)(2) and (b), which provides as follows.

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or

> subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted)). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

- 8 -

Instantly, the trial court found that Mother failed to complete her reunification objectives, and that she remains incapable of caring for the Children. Trial Court Opinion, 9/27/2016, at 35. In its opinion, the court directs our attention to its comments concerning Mother's lack of parental capacity at the conclusion of the termination hearing on June 21, 2016. *Id.* at 37-38. There, the court emphasized that Mother continues to suffer from depression, despite her testimony to the contrary. *Id.* at 37-38 (quoting N.T., 6/21/2016, at 58-60). The court further emphasized that this case began in August 2012, and that Mother has failed to advance beyond limited visitation with the Children. *Id.* at 37 (quoting N.T., 6/21/2016, at 58-59). The court concluded that while Mother participated in services, her efforts have "not resulted in anything concrete in [terms of] demonstrating an ability to parent these Children." *Id.* at 38 (quoting N.T., 6/21/2016, at 60).

In response, Mother presents several interrelated challenges to the trial court's findings, which we address together.[4] Mother argues that she

_____

[4] We observe that the third and fifth issues listed in Mother's statement of question involved are not included in the argument section of her brief, and that the argument section of Mother's brief includes an issue not listed in her statement of questions involved. Specifically, Mother makes no effort to argue in her brief that the trial court "erroneously [found] that witnesses who opposed the goal of adoption were only partially credible," or that the trial court "erroneously [found] that there was lack of services available to meet the [C]hildren's special needs in the county where [Mother] resided in/had moved to[.]" Mother's brief at 3. Instead, as detailed below, Mother argues that the court placed too much weight on a parenting capacity
*(Footnote Continued Next Page)*

completed, or was completing, all of her reunification objectives at the time the court terminated her parental rights. Mother's brief at 13-18. Mother contends that she completed parenting, anger management, and domestic violence programs; participated in mental health treatment; maintained income and housing; and complied with visitation. *Id.* Mother further argues that in making its findings the court relied too heavily on a parenting capacity evaluation prepared by psychologist, William Russell, Ph.D. *Id.* at 18-19. Mother contends that she made significant progress since being evaluated by Dr. Russell, and that the evaluation was "stale" since the termination hearing did not occur until over a year after it was completed. *Id.* at 18-19. Mother insists that Dr. Russell's opinions were subjective or speculative. *Id.* at 19.

Our review of the record supports the trial court's findings. During the termination hearing, on May 18, 2016, DHS presented the testimony of

*(Footnote Continued)* —————

evaluation. It appears that the third and fifth issues listed in Mother's statement of questions involved were included by mistake, as these issues do not appear to be related to this case. Further, Mother's concise statements include Mother's claim that the trial court placed too much weight on the parenting capacity evaluation, but do not include the third and fifth issues listed in her statement of questions involved. "We will not ordinarily consider any issue if it has not been set forth in or suggested by an appellate brief's statement of questions involved[.]" *Krebs v. United Refining Co. of Pa.*, 893 A.2d 776, 797 (Pa. Super. 2006) (citations omitted). Nonetheless, because Mother preserved her claim that the trial court placed too much weight on the parenting capacity evaluation in her concise statements, and because it appears that this issue was omitted from her statement of questions involved as the result of a minor typographical error, we decline to find that Mother has waived this issue for our review.

Community Umbrella Agency ("CUA") case manager, Devon Jacques. Mr. Jacques testified that the CUA established a single case plan to assist Mother in achieving reunification with the Children. N.T., 5/18/2016, at 23. Mother's reunification objectives included maintaining stable housing, gaining employment, completing classes at the Achieving Reunification Center, completing a parent capacity evaluation, stabilizing her mental health, and attending supervised visits. *Id.*

Regarding Mother's compliance with these objectives, Mr. Jacques testified that Mother maintains stable housing, and is able to support herself using Supplemental Security Income and assistance from her family. *Id.* at 30-31, 65. Mr. Jacques further testified that Mother completed parenting and anger management classes at the Achieving Reunification Center. *Id.* at 31. While Mother completed a parenting capacity evaluation with Dr. Russell, Mr. Jacques reported that Mother failed to comply with recommendations contained in that evaluation, which included obtaining a psychiatric evaluation and participating in therapy with A.S.M.B.1. *Id.* at 24-25, 28-29, 40. With respect to mental health, Mother participated in individual therapy throughout the life of this case, but that her attendance has been inconsistent. *Id.* at 25, 28. Mr. Jacques stated, "Mother was scheduled to go twice a month. Mother could go once a month. Mother could not go at all. Or [M]other could go." *Id.* at 28. Finally, Mr. Jacques explained that Mother attends her visits with the Children consistently, but that her visits have remained supervised due to the CUA's concern that

Mother would not be able to manage all of the Children at one time. *Id.* at 31, 33. Mother was pregnant with her fifth child at the time of the hearing, and Mr. Jacques believed that the addition of a newborn would be a destabilizing factor in terms of Mother's ability to care for the Children. *Id.* at 53, 89.

DHS also presented the testimony of Dr. Russell. Dr. Russell's testimony focused on the numerous traumas that Mother experienced throughout her life. Mother reported to Dr. Russell that she grew up in an environment where she was exposed to both physical and sexual abuse. *Id.* at 97. Mother reported being placed in foster care, and experiencing multiple inpatient psychiatric placements. *Id.* at 98. Mother was a victim of rape at the age of sixteen, resulting in the birth of A.S.M.B.1, and further was a victim of domestic violence. *Id.* Dr. Russell explained that Mother has been diagnosed with various mental health issues, including post-traumatic stress disorder, and bipolar disorder.[5] *Id.* at 103. Dr. Russell believed that Mother also suffers from "an adjustment disorder with disturbances of conduct and emotions." *Id.*

Dr. Russell further testified that Mother appears to be in denial with regard to the many traumas she has experienced. *Id.* at 100-101. Dr. Russell stated, "that's a real problem for someone who's been exposed to

---

[5] Mother testified that she was diagnosed with depression as a child, but that she does not currently suffer from depression. N.T., 6/21/2016, at 29, 48.

- 12 -

this much emotional turmoil. There has to be some level of awareness that all of these things that happened to me had to impact how I function." *Id.* at 101. Mother also appeared to be in denial with respect to the Children's placement in foster care. *Id.* Mother minimized any responsibility that she had for the Children's placement. *Id.*

Dr. Russell expressed concern regarding Mother's failure to obtain consistent mental health treatment, as Mother's mental issues impair her ability to care for the Children. *Id.* at 98-99, 103-04. Dr. Russell explained,

> When you're facing serious mental health issues it impacts your day-to-day function. It impacts how you think. It then impacts how you deal with your children. Because if you're suffering from mental health issues that impact[s] how you sleep, how you go and function during the day, how you react to different things, how [you] interact with the different milieus of your children's lives and [if] you don't address the issues, then it's going to trickle down to your children's behavior.

> ***

> Until [Mother] develops an understanding of the impact of the significant trauma she's experienced in her life, until she can develop an understanding of how all of that instability, all that chronic trauma, all that chaotic developmental history, until she can match that up with things she's experienced as an older adolescent and young adult I don't believe there can be any change because the denial was so prevalent in terms of, "I don't have any problems. I'm just sad my child's not here." The naivety came through . . . when she was presented with the question, "Well, your children have been out of your care now for quite a while, what if we were to return the children, what problems do you anticipate?" And the only problem she could come up with was, "Oh, I might have to adjust their sleep schedule."

*Id.* at 104, 112-13. Ultimately, Dr. Russell opined that Mother lacked the capacity to parent the Children at the time he evaluated her. *Id.* at 106.

Thus, the record confirms that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused the Children to be without essential parental care, control, or subsistence, and that Mother cannot, or will not, remedy the conditions and causes of this incapacity, abuse, neglect, or refusal. While Mother made progress with respect to several of her reunification objectives, she failed to consistently address her ongoing mental health issues. Critically, Mother failed to obtain consistent mental health treatment despite years of opportunities during the Children's placement in foster care. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Further, we reject Mother's claim that the trial court placed too much emphasis on the parenting capacity evaluation prepared by Dr. Russell. Dr. Russell thoroughly explained the conclusions contained in his evaluation during the termination hearing, and Mother's counsel cross-examined Dr. Russell at length concerning these conclusions. The court was free to weigh the parenting capacity evaluation as it saw fit, and we discern no basis upon which to conclude that Dr. Russell's conclusions were subjective or

- 14 -

speculative as Mother contends. We also discern no basis upon which to conclude that Dr. Russell's evaluation was "stale" by the time of the termination hearing. In her brief, Mother argues that the evaluation was stale in light of "significant achievements [she] made since that time, including additional parenting education, anger management, domestic violence training, and continued stabilization of housing." Mother's brief at 19. Tellingly, Mother does not suggest that she did anything new to resolve her unstable mental health, such as participating in the psychiatric evaluation recommended by Dr. Russell.

We next consider whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether

> any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Here, the trial court found that Mother is incapable of parenting the Children, and that she will not be able to remedy this parental incapacity in the near future. Trial Court Opinion, 9/27/2016, at 36. The court further found that the Children share a bond with Mother, but that it is not a parent/child bond, and that the Children will not suffer irreparable harm if Mother's parental rights are terminated. *Id.* at 37-38 (quoting N.T., 6/21/2016, at 60).

Mother argues that the Children view her as their mother and are bonded to her. Mother's brief at 18. According to Mother, the Children reciprocated the love and affection she displayed during visits, and she was able to address the Children's physical and emotional needs. *Id.*

We again discern no abuse of discretion. During the termination hearing, Mr. Jacques testified regarding the relationship that each of the Children has with Mother. With respect to A.S.M.B.1, Mr. Jacques testified that she calls Mother by her first name, and that her relationship with Mother resembles "almost a friendship at times or a sister relationship." N.T., 5/18/2016, at 36, 87. Mr. Jacques did not believe that terminating Mother's parental rights would cause irreparable harm to A.S.M.B.1. *Id.* at

36. He explained, "[A.S.M.B.1] knows that that is her mother. She knows that that's her siblings['] mother, but [A.S.M.B.1] is more so incline[d] to be with her siblings and has adapted to the pre-adoptive family." *Id.* at 36-37.

With respect to A.S.M.B.2, Mr. Jacques testified that he "enjoys being around his mother. . . . They interact with each other." *Id.* at 35. However, A.S.M.B.2 does not ask for Mother outside of her Thursday visitation, and Mr. Jacques opined that A.S.M.B.2 would not suffer irreparable harm if Mother's parental rights are terminated. *Id.* at 35-36. Mr. Jacques stated, "[A.S.M.B.2] knows that that is his biological mother. There's no doubt about that. [A.S.M.B.2] also know[s] that he visits with his mother only on Thursdays. Any other day of the week . . . he's in daily operation mode as to what his pre-adoptive family has him doing[.]" *Id.*

With respect to A.L.L.D., Mr. Jacques testified, "[A.L.L.D.] knows who his biological mother is. He calls her mommy when he's at the visit. They have an appropriate relationship." *Id.* at 41. Nonetheless, Mr. Jacques again did not believe that A.L.L.D. would suffer irreparable harm if Mother's parental rights are terminated, because he "was placed at a young age and . . . has been with the same caregiver up until today, that's who the child knows as his pre-adoptive parent in terms of who consistently takes care of him and provides care for him." *Id.* at 42-43. Similarly, with respect to A.M.D., Mr. Jacques opined that she would not suffer irreparable harm if Mother's parental rights are terminated. *Id.* at 44. Mr. Jacques explained, "[A.M.D.] came in at a young age. Again, she has an attachment with her

mother, recognizes that that is her mother during the visits, but she is bonded with the foster parents." *Id.*

Thus, it is clear that the Children know Mother and have a relationship with her. However, the record supports the trial court's conclusion that Mother and the Children do not share a parent/child bond, and that the Children will not suffer irreparable harm if Mother's parental rights are terminated. Given the Children's lack of a parent/child bond with Mother, and given the fact that Mother will not be capable of caring for the Children at any point in the foreseeable future, it was proper for the court to conclude that terminating Mother's parental rights would best serve the Children's needs and welfare.[6]

Based on the foregoing, we conclude that the trial court did not abuse its discretion by involuntarily terminating Mother's parental rights to the Children. In addition, we conclude that Mother waived any challenge to the orders changing the Children's permanency goals to adoption. We therefore affirm the termination decrees and goal change orders.

Decrees affirmed. Orders affirmed.

---

[6] The Children were removed from their pre-adoptive foster home following the first day of the termination hearing due to abuse allegations. N.T. 6/21/2016, at 6. Counsel for DHS indicated that the Children were placed in a respite foster home which is also pre-adoptive. *Id.* at 7.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/6/2017